IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CELINA MARIE H.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 20 C 1930 |
| v. | ) |
| | ) Magistrate Judge Gabriel A. Fuentes |
| KILOLO KIJAKAZI, Acting | ) |
| Commissioner of Social Security,[2] | ) |
| | ) |
| Defendant. | ) |

**ORDER**[3]

Before the Court are Plaintiff Celina Marie H.'s motion seeking remand of the Administrative Law Judge's ("ALJ") opinion denying her application for disability benefits[4] (D.E. 23) and the Commissioner's motion asking the Court to affirm the ALJ opinion. (D.E. 27.)

---

[1] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id*. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id*., citing *Doe v. Blue Cross & Blue Shield United of Wis*., 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court abides by IOP 22 subject to the Court's stated concerns.

[2] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[3] On May 4, 2020, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 12.)

[4] The Appeals Council ("AC") subsequently denied review of the opinion (R. 1), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021).

I.  **Administrative Record**

Plaintiff applied for disability benefits on January 5, 2017, when she was 18 years old. (R. 288.) The prior year, on January 29, 2016, when Plaintiff was in tenth grade, her mother admitted her to a hospital's adolescent psychiatric unit after Plaintiff said she wanted to die due to breaking up with her boyfriend, although she denied any intent to harm herself. (R. 605, 610.) Plaintiff was discharged after three days with a prescription for the antidepressant Zoloft. (R. 606.) She began outpatient therapy in April 2016. In May and June, Plaintiff's mental status exams were normal, although she described feeling sad and anxious, and her mother reported that Plaintiff was isolative and scared of people. (R. 646, 652, 655-59.) In August, Plaintiff told her therapist she had difficulty concentrating and did not want to return to high school. (R. 661-62.) Plaintiff did not feel Zoloft was working, and she regularly forgot to take it; her mental status exam was normal except for poor insight. (R. 662-63.) On August 22, Plaintiff went to the doctor complaining of lower back pain, which was relieved with lying down and Aleve; she was prescribed ibuprofen. (R. 684-85.)

On September 1, 2016, Plaintiff underwent a psychological assessment. (R. 674.) She reported that she did not take her antidepressant because it made her feel "airheaded." (*Id*.) Testing showed her overall intellectual abilities were in the low to very low range. (R. 676-78.) Plaintiff was assessed with major depressive disorder. (R. 680.) In November, Plaintiff told her therapist that she had low energy and spent most of her time in her room watching tv; she did not even go to the store with her mom. (R. 665.) On examination, her attention and concentration were intact, but she appeared somewhat apathetic and had poor insight and judgment; Plaintiff was prescribed the antidepressant Wellbutrin. (R. 665-66.)

On January 23, 2017, Plaintiff and her mother each filled out function reports. Plaintiff's mother wrote that Plaintiff was "fearful, scared of people" and sometimes heard voices. (R. 470-

2

71.) Both Plaintiff and her mother wrote that she went shopping with her mother and sometimes spent time with others at the mall, going to movies, eating out at restaurants and hanging out. (R. 470-74, 492-97.) However, Plaintiff maintained that she had no interest in social activities and had problems getting along with friends and family because she feared they would judge her. (R. 492-97.) In addition, her mother wrote that she needed reminders to take care of her hygiene, she did not do any chores, and she had trouble paying attention and following instructions. (R. 472, 475.)

On January 28, 2017, Plaintiff went to the ER because she experienced panic attacks and hallucinations after taking marijuana and LSD. (R. 777.) On January 30 and 31, Plaintiff attended a mental health intensive outpatient program, but she was transferred to the inpatient program at Hartgrove Hospital on February 2 due to worsening anxiety, paranoia, hallucinations, insomnia, uncontrollable crying, and feeling disconnected from her body. (R. 712-16, 730, 747.) Plaintiff reported that these symptoms began when she started using LSD during the summer; she denied using drugs since early January. (R. 747, 754-56, 759.) Plaintiff was discharged on February 9, and prescribed the antipsychotic risperidone and lorazepam for anxiety, agitation and trouble sleeping. (R. 743, 777.) However, Plaintiff was readmitted as a walk-in to Hartgrove on February 17,[5] because she said she felt "unsafe" and detached from her body. (R. 792-93.) Plaintiff refused medication, stating that they worsened her symptoms. (R. 811.)

On March 7, 2017, Plaintiff began psychotherapy with Marsha Snyder, APN. (R. 842.) Plaintiff reported feeling depressed and hopeless and being anxious around people, as well as having severe headaches (sometimes referred to as migraines) three to four times a week. (R. 842-46.) APN Snyder diagnosed Plaintiff with severe major depressive disorder with psychotic features and social anxiety disorder, and prescribed Lexapro (antidepressant), hydroxyzine (antihistamine

---

[5] The record does not indicate how long Plaintiff was in the hospital the second time.

3

for insomnia), and the antipsychotic medications Seroquel and risperidone. (R. 850-51.) On March 14, Plaintiff stopped taking Seroquel after it caused an oculogyric crisis (spasmodic movement of eyeballs), which was treated in the ER. (R. 922.) Plaintiff also stopped taking Lexapro due to nausea, and she discontinued hydroxyzine because she said it made her body feel "numb." (R. 913, 922.) Plaintiff said she did not socialize because she was worried that if she "freak[ed] out," her friends would also "get freaked out." (*Id.*) After Plaintiff reported occasional, continued feelings of detachment, APN Snyder increased her risperidone, but it caused an oculogyric crisis, which dissipated with medication. (R. 913.) APN Snyder recommended Plaintiff restart Lexapro. (R. 916.)

On March 23, 2017, Plaintiff underwent a psychological consultative exam with Mark Langgut, Ph.D., for her disability benefits application. During the exam, Plaintiff's emotions were inappropriate to the situation, and she was somewhat agitated, constantly moving her legs. (R. 832-33.) Plaintiff was fully oriented and had intact memory, limited and egocentric judgment, and her thought processes showed average coherence and normal speed. (R. 833.)

On March 28, Plaintiff told APN Snyder that she had few feelings of detachment, but she was concerned about side effects from risperidone, including weight gain, muscle stiffness and feelings of restlessness. (R. 903.) At their April meetings, Plaintiff's mood and affect were brighter and she had no feelings of detachment, although she still reported some feelings of being judged, so she remained isolated from her peers. (R. 865-67, 871, 876, 884-98.) APN Snyder discontinued risperidone and increased Lexapro. (R. 871.)

On April 13, a non-examining state agency psychological consultant found Plaintiff had a severe mental impairment but that it caused only mild difficulties in understanding, remembering, or applying information and adapting or managing oneself and moderate difficulties in interacting

4

with others and concentrating, persisting, or maintaining pace. (R. 342.) The consultant opined that Plaintiff could perform work that involved very short, simple instructions and occasional direct contact with the general public. (R. 344-45.)

On July 11, 2017, Plaintiff returned to APN Snyder with a brighter mood and affect, having spent a month with cousins in Wisconsin, which went well. (R. 855.) However, Plaintiff had stopped taking Lexapro, and after returning home, she felt detached and restless and had several episodes where she woke up at night feeling paralyzed. (*Id.*) APN Snyder counseled Plaintiff to stay on Lexapro and prescribed a low dose of the antipsychotic Abilify. (*Id.*) Plaintiff filled out another function report that month, writing that she stayed in bed all day with no motivation to dress or bathe, and got panic attacks due to social anxiety, but she went shopping for clothes and shoes. (R. 446-51.) She also wrote that due to memory loss, she could not complete tasks and needed reminders to take her medication. (R. 448, 451, 453.) Physically, Plaintiff wrote that she "cannot bend, stand or walk because of my bad back." (R. 453.)

On August 1, 2017, Plaintiff and her mother met with APN Snyder. Plaintiff had stopped taking Lexapro because she did not feel it helped; Abilify was helpful but she continued to have feelings of restlessness. (R. 933.) Plaintiff's mother said that Plaintiff had been depressed, moody and irritable all her life and was difficult to live with. (*Id.*) APN Snyder prescribed the mood stabilizer Lamictal and increased Plaintiff's dose of Abilify "to address psychosis and irritability." (*Id.*) That month, the state agency opinion was affirmed on reconsideration. (R. 355-60.)

On June 6, 2018, after a 10-month gap in the medical record, Plaintiff sought treatment for moderate lower back pain and left knee pain. (R. 953.) She reported having body aches and back pain for many years. (*Id.*) Plaintiff was prescribed naproxen, an antibiotic, and Tylenol with codeine. (R. 954.) On June 13, Plaintiff attended what appears to be her only session of physical

5

therapy ("PT"). (R. 996.) On exam, Plaintiff had thoracic (upper and middle back) and lumbar pain with provocation, flexion and extension. (R. 990.) X-rays of Plaintiff's spine were normal except for mild degenerative disease in her lumbar spine. (R. 993-94, 999-1000.)

Marsha Snyder, now Ph.D., completed a psychiatric questionnaire on August 20, 2018. She wrote that Plaintiff visited her when she was "in crisis," "after sustaining a year of psychosis <u>due to LSD use</u>."[6] (R. 943, emphasis in original.) Dr. Snyder recorded that on exam, Plaintiff was fully oriented and had good judgment and intact past memory, but she had refused to test for immediate memory and was unwilling to extend herself to attempt math and abstract thinking. (R. 944.) Dr. Snyder diagnosed Plaintiff with anxiety disorder and major depression and recommended she receive cognitive behavioral therapy. (R. 945.) Dr. Snyder opined Plaintiff could perform simple routine, repetitive tasks with a normal amount of supervision and understand and carry out simple instructions; however, she could not socialize with co-workers and supervisors, achieve production requirements or tolerate work pressures because "[s]he becomes easily overwhelmed and shuts down." (*Id.*) Dr. Snyder indicated Plaintiff had moderate restrictions in her ability to: perform daily activities (including attending meetings, working around the house, and socializing with friends and neighbors); understand, carry out and remember instructions; respond appropriately to supervisors and co-workers; perform simple, repetitive or varied tasks; and respond appropriately to work pressures. (R. 946-47.)

## II. September 12, 2018 Hearing

Plaintiff testified that she was depressed and has suicidal thoughts; she was taking Effexor (an antidepressant), which helped keep her calm but sometimes made her nervous or nauseous. (R. 307-08, 320.) Plaintiff did not like going out alone because she felt people were staring and judging

---

[6] Since August 1, 2017, Plaintiff saw Dr. Snyder only twice, on October 10, 2017, and August 14, 2018. (R. 943.)

her, and she spent most of the day in her room, but she sometimes went to the movies and out to eat with her father and sometimes saw her nephews and cousins. (R. 312, 315, 320, 329.) Other days, she could not sleep due to paranoia. (R. 328.) Plaintiff also testified that due to constant body pains, it took her hours to get out of bed in the morning. (R. 310.)

The vocational expert ("VE") testified that a significant number of jobs would be available to an individual who could perform all levels of exertion, but was limited to performing simple, routine, repetitive tasks in a low stress environment, with no interaction with the public and only routine, superficial interaction with coworkers and supervisors, and free from fast-paced work and flexibility meeting end of day goals. (R. 329-31.) The available jobs were performed alone and required only routine, superficial contact with others in the workplace. (*Id*.) There were no jobs for an individual who had to be 100% isolated from other workers. (R. 331-32.)

### III.     January 25, 2019 ALJ Opinion

The ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act since January 5, 2017, the date the application was filed. (R. 278.) The ALJ found that Plaintiff had the severe impairments of learning disability, anxiety disorder and depressive disorder, but that despite her allegations of severe body pain, that impairment was not severe because spine x-rays showed minimal or no impairment, Plaintiff went to PT only a couple of times, and physical exams revealed normal findings, including normal range of motion and strength and no swelling. (R. 279-80.) The ALJ found that Plaintiff's impairments, alone or in combination, did not meet a listing. (R. 280.)

Applying the Paragraph B criteria, the ALJ determined Plaintiff had mild limitation in understanding, remembering or applying information because the psychological consultative exam and Plaintiff's mental status exams did not indicate more than mild limitations in memory. (R.

281.) The ALJ found moderate limitation in interacting with others because although Plaintiff said she was afraid friends and family would watch her and judge her, she spent time with others going to the mall, the movies, hanging out, and talking with friends on the phone. (*Id*.) In addition, she was cooperative, friendly, and engaged, alert and oriented at the psychological consultative exam. (*Id*.) The ALJ determined Plaintiff had moderate limitations in concentrating, persisting or maintaining pace and adapting or managing oneself based on her function reports and her hospitalization following her marijuana and LSD use. (*Id*.) The ALJ assigned Plaintiff a residual functional capacity ("RFC") to perform work at all exertional levels but limited to work requiring her to "understand, remember, concentrate, persist, and perform at simple, routine, repetitive tasks in a low stress environment defined as having simple work-related decisions and occasional changes in the work setting; no interaction with the public; only routine, superficial interaction with coworkers and supervisors; work should be free from fast pace, but can meet daily quotas; and all tasks must be able to be learned through short, simple instructions." (R. 283.)

The ALJ found Plaintiff's allegations regarding the severity, persistence and limiting effects of her symptoms were not consistent with the evidence. (R. 286.) The ALJ noted that Plaintiff stopped taking her medications because she did not like their side effects, and she missed and cancelled medical appointments, including at least one time when she went out of town. (R. 285.) In addition, Plaintiff's mental exams revealed normal findings, "including a cooperative individual with an appropriate mood and affect, normal cognitive functioning, normal thought process, intact association, no suicidal or homicidal ideation, and normal insight and normal judgment, with a flat affect and impaired judgment also noted at times." (*Id*.) The ALJ also noted that despite Plaintiff's reports that she did not do any household chores, she was "described as

8

independent . . . [in] activities of daily living," and her "allegations of memory issues [we]re not supported by the overall evidence of record." (R. 286.)

The ALJ gave some weight to the opinions of the state agency psychological consultants but found that the overall evidence supported moderate limitations in adapting or managing oneself and greater restrictions in interacting with others, including supervisors and coworkers, "based on [Plaintiff's] ongoing complaints of increased anxiety when around others." (R. 287.) The ALJ also gave some weight to Dr. Snyder's August 2018 opinion as a whole, but little weight to the part of her opinion "regarding [Plaintiff's] alleged inability to socialize with coworkers and supervisors." (*Id*.) The ALJ reasoned that "[a]lthough [Plaintiff] alleged having increased anxiety when around others, . . . she [] also reported that she keeps in contact with friends, goes to the mall, to the movies, and 'hangs out' with others." (*Id.*) The ALJ further stated that "'socialization' is not required for work. Rather, the issue is whether [Plaintiff] can interact appropriately on a superficial level and take instructions," which the ALJ found was supported by the evidence in the record, including mental status exams showing "mostly normal findings, including normal memory, cognitive functioning, and insight and judgment." (*Id*.) The ALJ gave little weight to Plaintiff's mother's third-party function report because while it "provide[d] insight" into the severity of Plaintiff's symptoms and her ability to function, it did "not outweigh the lack of supportive objective evidence to restrict" Plaintiff beyond the limitations in the RFC. (R. 287-88.)

**IV.    Analysis**

Plaintiff contends that the decisions of both the ALJ and the Appeals Council contain errors that require remand. The Court addresses each decision in turn.

9

A. **The ALJ's Decision Was Supported by Substantial Evidence.**

An ALJ's decision will be affirmed if it is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, – U.S. –, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination. Rather, this court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (citations and quotations omitted).

1. **The ALJ's Treatment of Dr. Snyder's August 2018 Opinion Was Supported by Substantial Evidence.**

Plaintiff argues that the ALJ erred in assigning weight to Dr. Snyder's opinion. (D.E. 24: Pl. Mem. at 7-8.) For claims filed before March 27, 2017, as this one was, a "treating physician's opinion is entitled to controlling weight if it is supported by medical evidence and is consistent with the record. If an ALJ discounts a treating physician's opinion, the ALJ must adequately articulate the reasons for doing so, and explain her decision with reference to the nature and extent of the treating physician's treatment and his area of specialty." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 776 (7th Cir. 2022), citing 20 C.F.R. § 404.1527(d)(2) (internal quotations and citations omitted). Here, even "without marching through the factors referenced in § 404.1527(c)(2)," *Karr v. Saul*, 989 F.3d 508, 512 (7th Cir. 2021), the ALJ adequately articulated her reasons for rejecting Dr. Snyder's opinion that Plaintiff would not be able to socialize at work and giving some weight to the rest of the opinion.

The ALJ explained that Dr. Snyder's opinion that Plaintiff could not socialize with co-workers and supervisors was inconsistent with Dr. Snyder's treatment notes and other mental

10

status exams revealing mostly normal findings, "including a cooperative individual with an appropriate mood and affect, normal cognitive functioning, normal thought process, intact association, no suicidal or homicidal ideation, and normal insight and normal judgment, with a flat affect and impaired judgment also noted at times." (R. 285.) The ALJ also found the extreme limitation inconsistent with Plaintiff's function reports and testimony indicating that "she keeps in contact with friends, goes to the mall, to the movies, and 'hangs out' with others." (*Id.*) Furthermore, the ALJ determined that Dr. Snyder's opinion was not inconsistent with an ability to "interact appropriately on a superficial level and take instructions," as anticipated by the RFC. (*Id.*)

Plaintiff's contention that "[a]t the least, a 'moderately severe' limitation in responding appropriately to work pressure entails greater limitation in [her] ability to sustain work than the ALJ included in her RFC" (Pl.'s Mem. at 8) does not help her case, because "[i]t is unclear what kinds of work restrictions might address [her] limitations in concentration, persistence, or pace because [s]he hypothesizes none." *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019). Neither did the ALJ "substitute her own judgment" by determining that the evidence supported greater limitations than those suggested in the state agency opinions (Pl.'s Mem. at 9) because the ALJ "was just considering Plaintiff's condition and treatment—as required," together with the medical opinions in the record. *Deborah M. v. Saul*, 994 F.3d 785, 790 (7th Cir. 2021).

### 2. The ALJ's Decision Not To Include Limitations Related to Plaintiff's Headaches Was Not Error.

Plaintiff next contends that the ALJ erred by ignoring evidence of her migraines and failing to include related functional limitations in her RFC. (Pl. Mem. at 9-10.) First, as Defendant points out, Plaintiff did not contend that her headaches were a reason that she could not work either at the hearing – in which her counsel had the opportunity to ask her about headaches but did not – or in her function reports. (D.E. 28: Def.'s Resp. at 7.) Second, it is Plaintiff's burden to prove she is

11

disabled, and Plaintiff fails to meet that burden because she "has not pointed to any medical opinion or evidence to show [the headaches] caused any specific limitations." *Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021). As such, any error in the ALJ's failure to mention Plaintiff's headaches would have been harmless.

### 3. The ALJ Decision To Discount Plaintiff's Credibility Was Supported by Substantial Evidence.

Plaintiff also contends that the ALJ's credibility determination mischaracterized the evidence and failed to identify "any actual inconsistencies between [Plaintiff's] allegations and the other evidence." (Pl. Mem. at 11-12.) However, contrary to Plaintiff's arguments, it was not a mischaracterization for the ALJ to find that Plaintiff's allegations that she rarely went out alone and had problems getting along with people were inconsistent with evidence that Plaintiff spent time with friends and went to the mall and to movies. Plaintiff argues that there is no evidence she did these activities "often or regularly" (Pl.'s Mem. at 12), but the ALJ did not so find. Rather, the ALJ properly found that Plaintiff's repeated reports about socializing with family and friends (whether frequent or not) was inconsistent with her allegations that she almost never left the house.

In addition, contrary to Plaintiff's allegations (*id.* at 11-12), the ALJ's determination that Plaintiff's largely normal mental status exams were inconsistent with her allegations of severe functional limitations did not ignore evidence that Plaintiff continued to have depression and social anxiety, and that at times, her symptoms were so severe that they required hospitalization. The ALJ found that Plaintiff's depression and anxiety were severe, and the ALJ recognized that Plaintiff was hospitalized in early 2017 for a mental health crisis following extensive drug use, continued problems from which she addressed in subsequent meetings with Dr. Snyder. However, the ALJ noted that by April 2017, Plaintiff's mood and affect were brighter, and she spent the month of June 2017 on vacation in Wisconsin with her cousins. (R. 285.) Although Plaintiff had

12

setbacks when she stopped taking her medications, the ALJ noted that her mental status exams remained largely normal. (*Id*.) The ALJ did not err in finding Plaintiff's normal exams, together with her refusal to take her medications and multiple missed medical appointments, were reasons to discount Plaintiff's allegations.[7]

### B. The Appeals Council Did Not Err in Declining To Review Plaintiff's Additional Evidence.

Plaintiff also contends that the Appeals Council ("AC") erred in denying her request for review of the ALJ's decision. The AC will review a case if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5). Here, the AC noted these requirements and determined that the evidence Plaintiff submitted that pre-dated the ALJ's opinion "does not show a reasonable probability that it would change the outcome of the decision," and the evidence that post-dated the ALJ's opinion "does not relate to the period at issue[, and t]herefore, it does not affect the decision about whether you were disabled beginning on or before January 25, 2019." (R. 1-2.)

#### 1. This Court Has Jurisdiction To Review the AC's Decision.

As an initial matter, the Court rejects Defendant's contention that the AC's decision is not reviewable. (Def.'s Mem. at 13.)

> Our ability to review the Appeals Council's decision in the instant case is dependent on the grounds on which the Council declined to grant plenary review. If the Council determined [the] newly submitted evidence was, for whatever reason, not new and material, and therefore deemed the evidence non-qualifying under the regulation, we retain jurisdiction to review that conclusion for legal error. However, if the Appeals Council deemed the evidence new, material, and time-relevant but denied plenary review of the ALJ's decision based on its conclusion that the

---

[7] Plaintiff also argues that the ALJ should have given more weight to Plaintiff's mother's function report (Pl.'s Mem. at 13), but the ALJ adequately explained that her mother's statements, while providing insight into Plaintiff's impairments, did "not outweigh the lack of supportive objective evidence." (R. 287-88.)

> record—as supplemented—does not demonstrate that the ALJ's decision was contrary to the weight of the evidence—the Council's decision not to engage in plenary review is discretionary and unreviewable.

*Stepp v. Colvin*, 795 F.3d 711, 722 (7th Cir. 2015) (internal citations and quotations omitted).

As to the additional evidence post-dating the ALJ's opinion, the AC "deemed that evidence non-qualifying" because it "d[id] not relate to the period at issue;" accordingly, this Court may review that conclusion for legal error." *Rita Mary K. v. Kijakazi*, No. 21 C 4598, 2022 WL 17583780, at *4 (N.D. Ill. Dec. 12, 2022). With regard to the AC's determination that the evidence pre-dating the ALJ's opinion "does not show a reasonable probability that it would change the outcome of the decision," there is some disagreement within the Seventh Circuit as to whether the AC's statement is a legal determination of materiality since evidence is "material" if it "creates a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered," *Stepp*, 795 F.3d at 725, or whether it is a nonreviewable "discretionary weighing of the evidence." *Rita Mary K.*, 2022 WL 17583780, at *4 n.4. This Court agrees with the reasoning of the courts that have concluded that the language the AC used here "amounted to a rejection of the additional evidence as non-qualifying" because it is not new and material. *See Cavaricci J. v. Kijakazi*, No. 19 C 162, 2022 WL 1016406, at *3 (N.D. Ill. Apr. 5, 2022) (collecting cases). Accordingly, this Court has jurisdiction to review the AC's determinations for legal error.

### 2. The AC Did Not Err in Declining To Review Evidence Pre-Dating the ALJ's Decision.

Plaintiff submitted to the AC the following additional evidence pre-dating the ALJ's opinion:[8]

- 9/20/2018 rheumatology note. Musculoskeletal exam showed neck tenderness to palpation and multiple tender points on upper and lower back, as well as tenderness in knees, Achilles tendons and parts of hands and feet. (R. 213.) Plaintiff was prescribed meloxicam (for pain

---

[8] Plaintiff also submitted records from 1998 and 1999 but as none of her arguments refer to this evidence, the Court does not address them here.

14

and inflammation), PT and exercise, but Plaintiff's mother said she refused to walk due to pain. (R. 211, 215.)

- 12/13/18 rheumatology note. Plaintiff discontinued meloxicam after one week because it upset her stomach and she refused to go to PT. (R. 194.) Fibromyalgia suspected due to negative rheumatological workup. (R. 194, 198.) Musculoskeletal exam had same results as 9/20. (R. 196.) Prescribed warm water PT to help Plaintiff exercise and Tylenol and ibuprofen for pain. (R. 198.)

- 1/7/19 internal medicine note. Plaintiff complained of depression and aching pain in her back and shoulders, reportedly unchanged since August 2018. (R. 199.) Plaintiff took acetaminophen 1,000 mg as needed and requested medical marijuana for pain control. (*Id*.) Musculoskeletal exam showed tenderness to palpation along back of neck and shoulders and lower back. (R. 202.) Plaintiff refused to take fibromyalgia drugs or antidepressants due to poor experiences with medications in the past. (R. 205.) She also refused PT because it worsened her pain, and she did not see a therapist because she thought it was not helpful. (R. 199.) The doctor recommended exercise for symptom management and prescribed naproxen and acetaminophen for breakthrough pain. (R. 206.)

Plaintiff contends that the AC should have reviewed this evidence because it was new and material. Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Stepp*, 795 F.3d at 725. Although the additional evidence existed before the ALJ issued her decision on January 25, 2019, Defendant does not dispute that the evidence is new, so the Court proceeds to address the issue of materiality.

Plaintiff contends that this evidence is material – *i.e.*, creates a "reasonable probability" that the ALJ would have reached a different conclusion – because it "confirmed" that fibromyalgia was the source of Plaintiff's pain, and the ALJ's determination that Plaintiff's body pain was not severe relied on June 2018 examinations and imaging that showed minimal objective sources of her pain. (Pl.'s Mem. at 14; *see also* D.E. 29: Pl.'s Reply at 6.) However, Plaintiff's argument omits a significant part of the ALJ's Step Two reasoning. In addition to noting that medical imaging did not show a source for Plaintiff's pain, the ALJ determined that Plaintiff's body pain was not as severe as she alleged because she refused to return to PT and physical exams revealed normal findings. (R. 279-80.) Although the additional evidence indicated "suspected"

15

fibromyalgia suspected due to a negative rheumatological workup, Plaintiff continued to refuse to attend PT, exercise, and take medication other than acetaminophen to treat her alleged pain, despite her physicians' referrals and recommendations to do so. Moreover, the later medical notes suggest that Plaintiff's body aches could be related to depression, but she refused to see a therapist or take antidepressants. As in *McFadden v. Berryhill*, the Court finds that the AC did not err in determining that the additional evidence was unlikely to result in a finding that Plaintiff was not disabled because it "highlighted precisely th[e] chain of events" that led the ALJ to conclude Plaintiff was not a credible witness. 721 F. App'x 501, 506 (7th Cir. 2018).

### 3. The AC Did Not Err in Declining To Review Evidence Post-Dating the ALJ's Decision.

Plaintiff also submitted to the AC the following evidence post-dating the ALJ's opinion:

- 2/4/19 internal medicine note. Plaintiff again sought medical marijuana for fibromyalgia and refused any other medications and PT, stating that she did not like side effects from naproxen. (R. 88.) The doctor said depression might be contributing to symptoms, but Plaintiff wanted to avoid all medications. (R. 92.)

- 4/16/19. Internal medicine note. Plaintiff again sought medical marijuana referral. (R. 60.) She reported having diffuse body aches, numbness and tingling in her hands and spending all day in bed. (*Id.*)

- 4/26/19. Neurology consult. Plaintiff reported that she had developed a "new type" of sharp head pain in January 2019. (R. 73.) Neurological exam was normal; the neurologist opined that Plaintiff's pain was likely related to migraines and fibromyalgia. (R. 76-77.)

The AC determined that "[t]his additional evidence does not relate to the period at issue," and there did "not affect the decision about whether you were disabled beginning on or before January 25, 2019." (R. 2.) Plaintiff contends that despite post-dating the ALJ's decision, this evidence relates to the period at issue "because it represents ongoing efforts to ameliorate a chronic condition that affected [Plaintiff] well before the ALJ's decision." (Pl.'s Mem. at 15.) However, continued efforts to alleviate Plaintiff's alleged body aches and headaches (presuming Plaintiff did

16

not present with a totally new type of head pain in April 2019) – which notably still did not include medication or PT, but only a request for medical marijuana – does not "relate to" the ALJ's determination that Plaintiff's aches were a severe impairment before January 25, 2019. Accordingly, the Court finds that the AC did not err in refusing to consider the additional evidence Plaintiff submitted.

## CONCLUSION

For these reasons, the Court denies Plaintiff's motion to remand (D.E. 23) and grants the Commissioner's motion asking the Court to affirm the ALJ opinion. (D.E. 27.)

ENTER:

_____
**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: January 18, 2023**